In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-254 CR


____________________



THE STATE OF TEXAS, Appellant



V.



TERRI LYNN DORNBURG, Appellee






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 04-10-08405






MEMORANDUM OPINION


 The State prosecutes this appeal from an order granting appellee Terri Lynn
Dornburg's motion to dismiss for failure to provide Dornburg with a speedy trial in violation
of both the United States and Texas Constitutions. See U.S. Const. amend. VI; Tex. Const.
art. I, § 10. The resolution of the issues before us, as is typical in most appeals involving a
speedy trial matter, requires a careful examination of the historical facts of the particular
prosecution. In the instant case, the general theory of prosecution involved allegations that
Dornburg, while an assistant district attorney, agreed to dismiss, in exchange for money,
certain misdemeanor cases against defendants represented by her husband, a local criminal
defense attorney. Both Terry Dornburg and her husband, Brent Dornburg, ("Brent") were
eventually indicted, with appellee being initially indicted for the offenses of bribery and
tampering with a governmental record, and later re-indicted only for the offense of bribery. 

 On appeal, the State contends the trial court abused its discretion in granting the
motion to dismiss because appellee contributed to the delay, failed to timely assert her right
to a speedy trial, and failed to show actual prejudice resulting from any delay. The State's
complaints are taken from the detailed speedy trial analysis constructed in Barker v. Wingo,
407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Barker Court made the following
observation, the significance of which should become apparent as this opinion progresses: (1) 
 The right to a speedy trial is generically different from any of the other
rights enshrined in the Constitution for the protection of the accused. In
addition to the general concern that all accused persons be treated according
to decent and fair procedures, there is a societal interest in providing a speedy
trial which exists separate from, and at times in opposition to, the interests of
the accused. The inability of courts to provide a prompt trial has contributed
to a large backlog of cases in urban courts which, among other things, enables
defendants to negotiate more effectively for pleas of guilty to lesser offenses
and otherwise manipulate the system. 


 . . . .


 A second difference between the right to speedy trial and the accused's
other constitutional rights is that deprivation of the right may work to the
accused's advantage. Delay is not an uncommon defense tactic. As the time
between the commission of the crime and trial lengthens, witnesses may
become unavailable or their memories may fade. If the witnesses support the
prosecution, its case will be weakened, sometimes seriously so. And it is the
prosecution which carries the burden of proof. Thus, unlike the right to
counsel or the right to be free from compelled self-incrimination, deprivation
of the right to speedy trial does not per se prejudice the accused's ability to
defend himself.


 Finally, and perhaps most importantly, the right to speedy trial is a more
vague concept than other procedural rights. It is, for example, impossible to
determine with precision when the right has been denied. We cannot definitely
say how long is too long in a system where justice is supposed to be swift but
deliberate. . . . There is nothing comparable to the point in the process when
a defendant exercises or waives his right to counsel or his right to a jury trial. 
Thus, as we recognized in Beavers v. Haubert, supra, [198 U.S. 77, 25 S.Ct.
573, 49 L.Ed. 950 (1905)] any inquiry into a speedy trial claim necessitates a
functional analysis of the right in the particular context of the case: 'The right
of a speedy trial is necessarily relative. It is consistent with delays and
depends upon circumstances. It secures rights to a defendant. It does not
preclude the rights of public justice." 198 US, [sic] at 87, 49 L Ed at 954.


Barker, 407 U.S. at 519-22, 92 S.Ct. 2182, 33 L.Ed.2d at 110-12. (emphasis added)(footnotes
omitted).

 Since Barker, reviewing courts have been analyzing federal constitutional speedy trial
claims "on an ad hoc basis" by weighing and then balancing four factors: 1) length of the
delay, 2) reason for the delay, 3) assertion of the right, and 4) prejudice to the accused. 
Barker, 407 U.S. at 530; State v. Munoz, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). This
balancing test requires a case-by-case weighing of "the conduct of both the prosecution and
the defendant." Barker, 407 U.S. at 530; Munoz, 991 S.W.2d at 821. No single Barker
factor is a "necessary or sufficient condition to the finding" of a speedy trial violation. 
Barker, 407 U.S. at 533. These four factors "must be considered together with such other
circumstances as may be relevant." Barker, 407 U.S. at 533; Munoz, 991 S.W.2d at 821. 

 "An appellate court reviewing a trial court's ruling on a motion to dismiss for want
of a speedy trial must do so in light of the arguments, information, and evidence that was
available to the trial court at the time it ruled." Shaw v. State, 117 S.W.3d 883, 889 (Tex.
Crim. App. 2003) (citing Dragoo v. State, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003)). The
appellate court must uphold the trial court's ruling if it is supported by the record and is
correct under the applicable law. Shaw, 117 S.W.3d at 889 (citing Munoz, 991 S.W.2d at
821). Because appellee prevailed on her speedy trial motion, "we must presume the trial
court resolved any disputed fact issues in appellee's favor, and we are required to defer to
these implied findings of fact that the record supports." See Munoz, 991 S.W.2d at 821.

 A proper discussion of the issues presented requires reproducing the procedural
background of appellee's prosecution and selected excerpts from hearings on pretrial
motions.


PROCEDURAL HISTORY



 April 30, 2002 -- Appellee is indicted for Tampering With Governmental
Record and Bribery (Trial Cause Nos. 02-04-02884-CR & 02-04-02885-CR). 


 May 1, 2002 -- Judge Alworth signs personal recognizance bond in the Bribery
cause. (2) 


 June 18, 2002 -- Trial counsel files written notice of representation in both
causes. 


 June 20, 2002 -- Appellee files written motion to determine the validity of the
May 2002 appointment of the attorney pro tem. 


 June 26, 2002 -- Trial court's scheduling order contains the following settings: 
August 14, 2002, for hearing-date for pretrial motions; October 9, 2002, for
docket call; October 14, 2002, for first trial date. 


 October 31, 2002 -- In both causes, State files "Motions, Pleas and
Announcements Notice" listing a new date for pretrial motions as "February
12, 2003." 


 October 12, 2004 -- Appellee is re-indicted for Bribery with new trial cause
number of 04-10-08405-CR. 


 October 13, 2004 -- Appellee files "Unopposed Motion To Transfer Bond"
under new bribery cause. 


 October 13, 2004 -- In new bribery cause, a "Scheduling Order" is filed,
setting "October 20, 2004," for appellee's arraignment in re-indicted cause. 


 October 20, 2004 -- State files motions to dismiss cause numbers 02-04-02884-CR and 02-04-02885-CR, with the trial court's granting the motions on
that date. 


 October 20, 2004 -- Trial court signs and files "Discovery Order" in re-indicted cause, with the State to furnish the listed discovery to appellee on or
before November 3, 2004. 


 October 20, 2004 -- In re-indicted cause, trial court files "Scheduling Order"
listing the following settings: January 12, 2005, for docket call; January 18,
2005, as date of trial. 


 December 16, 2004 -- Appellee files "Joint Motion For Continuance,"
requesting to reset the docket call to April 6, 2005, and requesting to reset the
date of trial to April 25, 2005. Trial court grants this motion and resets the
cause to the dates requested. 


 March 31, 2005 -- Appellee files written "Request For Notice" motion,
requesting the State provide notice of intent to use extraneous act/offense
evidence during guilt/innocence and punishment phases of trial. 


 April 6, 2005 -- Appellee files "Motion For Continuance," alleging that
discovery is ongoing and incomplete at that time, so that any pretrial motions
and further preparation for trial "must await this important discovery." Trial
court grants motion, and lists the following resetting dates: May 4, 2005, for
pretrial motions; May 16, 2005, for docket call; May 24, 2005, as new trial
date. 


 April 29, 2005 -- Appellee files four written motions: "Motion To Transfer
Motions"; "Motion To Recuse And Or Disqualify The Montgomery County
District Attorney, And All Members Of His Staff, From Participation In This
Case"; "Motion For Discovery," and "Motion To Dismiss Due To Violation
Of Terri Lynn Dornburg's Right To A Speedy Trial." Trial court grants
appellee's speedy trial dismissal motion, resulting in the instant appeal. 


PRETRIAL HEARINGS
 

 Before us are hearings that took place on April 6, 2005, May 4, 2005, May 10, 2005,
and May 11, 2005. It was at the conclusion of the hearing on May 11, 2005, that the trial
court granted appellee's motion to dismiss for lack of a speedy trial, and dismissed her
pending bribery indictment. As noted above, appellee was initially indicted on April 30,
2002, and re-indicted on October 12, 2004. While the hearings of May 4, 2005, and
especially May 10, 2005, addressed appellee's speedy trial motion, we find the arguments
contained in the April 6, 2005, hearing significantly probative for use in our later application
of the Barker balancing test.

 Recall from the pretrial chronology that on April 6, 2005, appellee filed a motion for
continuance. A motion for continuance had also been requested by appellee's husband,
Brent, as his case was also pending at the time. Therefore, the hearing conducted on April
6, 2005, was intended by the trial court to address both requests for continuance. Trial
counsel for both appellee and Brent jointly addressed the merits of the motions. We find the
following excerpts from the April 6, 2005, hearing to be directly pertinent to certain factors
in the Barker balancing test:

 THE COURT: I have required a hearing on a motion for continuance
that was filed in two motions. One filed in each case. Mr. Nugent has filed
one on behalf of Brent Dornburg, and this was filed, I think, this morning. It
has the file stamp on it. And the second was filed on behalf of Terri Lynn
Dornburg by Mr. DeGeurin and the State has received copies of those motions. 


 . . . .


 THE COURT: Okay. My is [sic] concern is that this case - - actually,
I did not know that this case was even in my court for what amounted to
almost two years' time because nothing had happened on this case. We don't
set our criminal dockets here, and so - - actually, it's a reindictment so it
carries a cause number with a 04, but it was an older case than that. And until
it appeared [sic] on a motions docket, I didn't realize that I even had this case
pending in the court. We have since appointed a special prosecutor. We've
gotten everybody in line, I think. I need to know why we need a continuance
in this case. Why you are asking for one, Mr. Nugent, for Mr. Dornburg? The
trial date we have I believe is April 25th. Is that correct? We're set for trial on
that Monday.


 . . . .


 MR. NUGENT: Judge, if I may point out, Mr. Dornburg was not
recharged. He was initially charged in '04 in October of '04.


 THE COURT: That was his original indictment then - - 


 MR. NUGENT: That's correct, Your Honor. 


 THE COURT: I guess they reindicted Ms. Dornburg from - - 


 MR. NUGENT: Correct.


 THE COURT: - - from 02 - 04. So it was reindicted from April '02
original indictment. Okay. Mr. Nugent, on behalf of Mr. Dornburg.


 MR. NUGENT: Yes, Your Honor. We have been working diligently
going through the discovery. Mr. Wilson [State's attorney pro tem] has made
the discovery available. We have spent literally days and days and days at the
D.A.'s office here where Mr. Wilson made the material available. We've gone
through the material that's been made available. Mr. DeGeurin, speaking with
Mr. Wilson, I believe, this week - - and we've been working together, Your
Honor - - Mr. DeGeurin learned this week that - - from Mr. Wilson, that there
are some additional discovery that Mr. Wilson didn't have yet; and I have not
seen that yet, so there is still additional discovery. This is, of course, a very
serious case. And before I can intelligently file appropriate motions, I need
to have gone through all the discovery and there were reports that Mr. Wilson
didn't have available yet. He's agreed with Mr. DeGeurin to make everything
available, so we're still going through discovery. We've been diligent, in my
opinion, Your Honor. We've made numerous trips up here and sat down and
gone through the material. But there is additional material, and until we go
through that, we, of course, can't render effective assistance of counsel and
certainly can't announce ready for trial before we've seen critical and
relevant discovery so that's why I'm asking for a continuance, Your Honor. 


 THE COURT: Okay. Based on the case law that I have before me - -
and, of course, we all know that Article 29.01 of the Code of Criminal
Procedure, would allow - - or 29.03 for sufficient cause shown, that this
continuance would be granted. I'm looking at every case that I've been able
to pull from the early Twenties. A motion for continuance, you both
understand, all understand, is not a matter of right like other motions. It
depends on the surrounding circumstances of the case as well as upon other
matters of diligence. I need to know specifically - - you have alleged in
Paragraph 2 some kind of report, Mr. Bluestein's report. I don't know what
that is. 


 MR. DEGEURIN: May I address that, Your Honor?


 THE COURT: Well, we can - - we'll hear both motions then at the
same time probably unless there is any reason that anyone can see not to.


 MR. NUGENT: I have no objection to arguing these together, Your
Honor.


 THE COURT: Any problem, Mr. Wilson?


 MR. WILSON: No, Your Honor.


 THE COURT: Okay. Mr. DeGeurin?


 MR. DEGEURIN: Your Honor, one of the reasons that this case, these
cases now, have had the history that you've been made aware of starting a long
time ago, is that Mr. Bluestein in the district attorney's office here began an
investigation and headed up the investigation of Terri Lynn Dornburg. And
there was a misstep in the beginning by the Attorney General's office came
[sic] in and county shared responsibility with the D.A.'s office in some initial
investigation and an initial indictment. Thereafter, it was determined that it - -
that needed work and the Attorney General's office was really not available
anymore for various reasons and so Mr. Terry Wilson was then appointed. So
that really kind of began with the today [sic] cases that you have.

 Now, Mr. Bluestein was attending the original hearings even though the
Attorney General's office was here also. Then at the point that Terry Wilson
became involved, Mr. Bluestein backed away and left only the D.A.'s office
an investigator, Mr. Stevenson, to aid Mr. Wilson. It's Mr. Bluestein's report
which is - - concerns the statements made by the defendant, Terri Dornburg,
and statements made by the defendant, Brent - - Brent - - that was missing
from the file when the discovery process was being conducted. That was an
inadvertent thing on the part of Mr. Wilson. We've been up here for three
days, so what we end up with, Your Honor, a long story short, is on the eve of
trial we still don't have even the defendant's statements. And because these
two cases may very well be tried together, or tried separately, even decisions
with regard to the order of trial and the motions that are necessary could not
even be addressed until that report was made available. 

 Mr. Wilson started asking around about the report. Thought he had it
himself, and he did not have it with him. And learned only - - we learned
yesterday that he was going to obtain it from either his own home where he
had it or his office or Mr. Stevenson was going to get it for him. So it is
absolutely an essential piece. It's not just a piece of discovery. It is the most
important part of the discovery with regard to our legal planning, strategy,
and preparation for pretrial motion. We have now, as I understand it, today,
been handed the report. We haven't read it yet. 


 THE COURT: You have the report then?


 MR. DEGEURIN: We do have the report today.


 THE COURT: Mr. DeGeurin, with all respect, I can't imagine that a
gentleman of your experience in criminal law needing such an essential report,
would have waited until this point to ask this court for some help in getting
that report.


 MR. DEGEURIN: Well, Your Honor, that's a good point; but what is,
in today's time, informal discovery, sometimes go further than what the Court
could order as a matter of law. Although, I could argue this entire report is
necessary as a matter of law, it is not only Mr. Bluestein's thoughts and
agenda, stuff like that, but, in addition to including the statements of the
defendant. So I could envision a hearing where the Court could say in the end,
well, you can give them the statements attributed to the defendants, but I
cannot order, Mr. DeGeurin, that you get the whole report. You will have to
wait until trial and then we would be in a whole another ball. We would have
to file a bunch of unnecessary motions and severances and things like that. So
there is some benefit, especially where the clients are not in custody, and they
are not a threat to the community while awaiting trial, and it is not opposed
by the State, there are some times that it's a benefit to have the informal
discovery. That's why we haven't burdened you with a motion.


 THE COURT: Anything further, Mr. Nugent? The motions for
continuance are identical except for the names of the defendants as far as I can
tell, so it seems that you might be arguing the same facts. 


 MR. NUGENT: Yeah, I won't replow the ground that Mr. DeGeurin
has plowed, Your Honor; but I would add that we can't intelligently and
professionally file appropriate case specific pre-trial motions until we've
gotten all the discovery. And my understanding now is that we now have
received all the discovery. We've learned today that there is about 1200 pages
of documents have been filed in the Clerk's office. We were given notice
today. There is 65 pages, 263 pages, 808 pages, so something over a thousand
pages have been filed today. We'll, of course, need to go through those
thousand pages. We'll need to go through the statements that we've just
gotten today and then decide what motions are appropriate and file those with
Your Honor, and we have been working diligently. We've spent over a week
at the office up here and we're talking all day going through reports and
information that Mr. Wilson has made available. We had assumed that that
was everything; and I think Mr. Wilson had assumed that was everything and
it was only this week that Mr. DeGeurin and Mr. Wilson realized that there
were some important information that, for whatever reason, inadvertently had
not been made available. So, we have been working diligently. This is our
first trial setting, and I would like to render effective assistance of counsel to
my client, Brent Dornburg, and I would respectively ask for time to go through
the 1100 pages that have been filed, to go through the reports that have been
provided today, file the appropriate motions, then ultimately have our day in
court before Your Honor when we've had time to prepare. 


 THE COURT: Any response, Mr. Wilson?


 . . . .


 MR. WILSON: Your Honor, I'm not going to oppose their motion. 
There is a lot of material. They have had a lawyer that spent a lot of time up
here looking at it, so I can understand that. I apologize to the Court for the
report not being in the file. I thought it was there, but it was in a different file,
had not gotten copied from the discovery file. The stuff that was filed with the
clerk today is bank records of the defendants, and it is obviously from the
number of pages that was cited to the Court, extensive amount of bank
records. Most of it not relevant to this case because it's, you know, the typical
circumstance where you file a whole bunch of bank records or over a period
of time, bank records with all the checks that were written and that kind of
thing. But I'm not going to oppose their continuance because I think if we
have a little time to work together, there may be some things that we can agree
on that we might cut out a few witnesses and make this process a little more
expedited for the court. 


 . . . .


 THE COURT: Okay. Mr. Nugent and Mr. DeGeurin, what kind of time
are you asking? You've got the report there on your counsel table here in the
courtroom. Mr. Wilson, is that the only report from David Bluestain that you
know exists?


 MR. WILSON: Yes, ma'am. That's the only report. There are some
tape recordings they've asked about of other people who primarily know
nothing. . . . 


 . . . .


 MR. DEGEURIN: Your Honor, my suggestion would be - - and I'm
doing this cautiously - - since there are now I know some tapes that, yes, we
do want to come listen to them. It's not a waste of time on our part, I don't
think. Those tapes are very important. If we would - - have if we could reset
this 45 days to complete - - by the way, Your Honor, I just thumbing through,
I'm noticing a number of people that now need to be interviewed that we
haven't interviewed, and that's leaving the office going and trying to making
[sic] arrangements. 


 THE COURT: You have investigators who can help do that, too. Is that
correct?


 MR. DEGEURIN: You don't know me, Judge.


 THE COURT: You don't use them.


 MR. DEGEURIN: Not for interviewing witnesses.


 THE COURT: Okay. So at 45 days, I'm going to - - where is our - - do
we have a list of next trial dates?


 MR. DEGEURIN: For a final motion hearing is what I'm thinking at
that time. 


 . . . .


 THE COURT: . . . I'm going to grant the motion for continuance only
because I feel that the matters contained in Mr. Bluestein's report are of such
a nature that it effects [sic] the ability of Mr. Nugent and Mr. DeGeurin to
represent their clients effectively; however, I am not going to continue it for
45 days just for the motions. I am going to give you until May 4th for your
motions to be filed. That is almost a month. Then we will have - - I'm going
to have a call docket where we will announce ready. I'll just make this myself
on May 16th and trial on May 23rd. So your dates are that by May 4th, your
motions will be heard that day. You will have to get them filed. Give notice
to the other side. We will have a motions hearing that afternoon. . . . 


 The lengthy recitation above from the April 6, 2005, continuance hearing exposes an
inconsistency regarding appellee's speedy trial claim in light of subsequent events. At some
point during the twenty-three day period from the April 6 continuance hearing to April 29,
2005, the date appellee filed her speedy trial dismissal motion, trial counsel did an "about-face" on the necessity for a forty-five day continuance for extensive discovery and pretrial
motions preparation. Recall that during the April 6 continuance hearing, when confronted
by the trial court with the concern for further delay in appellee's prosecution, trial counsel
pleaded that vital discovery was still on-going and that only more time would permit him to
file legally effective pretrial motions benefitting appellee. Apparently, on April 6, 2005, a
further forty-five day delay would work in appellee's favor as no employment hardships,
stress, anxiety, or any other difficulty was acknowledged by trial counsel on appellee's
behalf from further postponement. Yet, as will be quite apparent from hearing-excerpts
reproduced below, especially appellee's testimony at the May 10, 2005, hearing, during
almost the entire three years preceding the filing of the speedy trial dismissal motion,
appellee's life, and that of her family, was essentially in a state of devastation. 

 At the first hearing addressing appellee's speedy trial motion, conducted on May 4,
2005, appellee's trial counsel advanced a markedly different position from that presented to
the trial court at the April 6, 2005, continuance hearing - - less than one month before. At
the April 6 hearing, appellee requested a continuance, while on May 4, she argued the delay
in putting her to trial violated her speedy trial right. At the May 4 hearing, the State was
permitted to attempt to explain the delay in prosecuting appellee. The trial court also
reminded trial counsel of its concern regarding any further trial delay. The more pertinent
exchanges from the May 4, 2005, hearing are reproduced as follows: 

 THE COURT: All right. Any response, Mr. Wilson?


 MR. WILSON: Yes, Your Honor. If I could find it just a second. Your
Honor, Ms. Dornburg was indicted by the Attorney General's office personnel
who were operating under the auspices of the local district attorney system
here. That indictment occurred back in 2002. Some time passed after that
indictment and I was appointed as attorney pro tem to take over the case. At
that point in time, I looked at the indictment, saw that I did not believe that I
could proceed to trial under that indictment and was - - it was suggested that
I proceed to investigate and prosecute the case so I began the investigation.

 In order to do that, we spent months reviewing all of - - finding first and
then reviewing every dismissal of a misdemeanor in this county over a period
of three years. We then proceeded to subpoena bank records of - - for four or
five different people, and ten different bank accounts, and to this day, we still
don't have all those bank records. We have repeatedly dealt with the banks
and whatnot. We proceeded with this. We hired an outside expert to sort the
bank records for us and go through them to speed up the process. We've done
that. And in terms of the motion for discovery, that might be my one expert
witness that I might call. I don't know yet whether I will. But I will provide
counsel with a copy of her information that she's given us. 

 The case was then presented to the Grand Jury and indicted. It was
done within the statute of limitations of the original offense, and it was done
as expeditiously as we could under the circumstances. 


 THE COURT: So it was reindicted in October of '04?


 MR. WILSON: It was myself and one investigator, Mr. Stephenson,
who had to review all of those files, talk to the - - find and then talk to the
witnesses. In many cases, the persons who had the DWI cases or the whatever
kind of cases they were, go find them and talk to them, maybe review their
bank records, things of that nature, to work up to the point of taking this case
to Grand Jury.


 . . . .


 THE COURT: Mr. DeGeurin, I think it was this Court's anxiety that
first raised some attention. Literally, in September at a - - I had a conversation
with another judge wondering what had happened ever to the Dornburg case
because I had not - - I heard those splashy headlines. Then I had not seen a
single thing. I literally did not know in September of 2004 that that case was
sitting in my own court. 


 MR. DEGEURIN: I know.


 THE COURT: Had no idea.


 MR. DEGEURIN: I know.


 THE COURT: And when this group came together in October and there
was a new indictment coming down, and - - October 20th, and you appeared
and Terri Lynn Dornburg appeared. There was an arraignment and a plea
entered. I was absolutely appalled and I expressed this probably in chambers
about how unhappy I was that I had no idea that this case was even sitting here
because it hasn't followed the normal route that it would through the
Montgomery County DA's office, and was not totally disposed of within six
months tops for our cases that come down from indictment to trial, or at least
arraignment to trial. I was appalled that it had been so long. One of the
moments when I was most appalled was in December when you joined in with
a joint motion for continuance to move the trial date some. And that's when
I said absolutely this date that we are heading to now is it. That is it because
I am appalled at the time that had passed that I did not know that this case was
sitting in my own court and the time that nothing had been done on the case
from either side until that point when we put a scheduling order into place and
got this thing rolling and went forward. So there was no one who expressed
probably more anxiety than this own judge did at what was happening;
however, it was at that occasion that you, yourself, were joining in a motion
for continuance to get a new date here. And I think - - let's see. One of the
reasons was - - I have the joint motion here. It was set for April but discovery
was ongoing and incomplete at this time. 


 MR. DEGEURIN: There had been none at that time. 


 THE COURT: Mr. Bluestein's report was inadvertently not in the file
which was provided to defense counsel. This was your motion for continuance
on April 6th, actually. This one came down. So there was an earlier one in
December. Here we go. That was a joint motion asking on December 16th - -
it was set, then, for January; and counsel for both of these - - let's see - - have
agreed for whatever reason to continue this case. And I'm sure that you must
have told me something that isn't in this motion because somehow I found
good cause to allow both of you, and you signed off on the bottom - - agreed
with Terry Wilson and Mike DeGeurin to move the case to the April setting.


 MR. DEGEURIN: Your Honor, I agree -- 


 THE COURT: So it's a hard thing for me to hear. I think at one point --


 MR. DEGEURIN: Why would it take two and half to three years to
indict the case after it had been indicted? 


 THE COURT: Right. Well, I have been - - it's been explained that
there was serious problems with that indictment, and I don't know that. I don't
know what the other one looked like. I haven't even seen that. But I know
that you, yourself, were urging a motion for continuance moving it even
further down on two occasions we had that motion. So I'm hard pressed to
find that there was much anxiety on your side. I mean, your client is a human
being, and I understand that. But your argument is hard to take because you
were behind some of those motions for continuance. 


 MR. DEGEURIN: Your Honor, you're hitting the nail right on the
head, and I can hardly wait to express my thoughts about this. That's why I
say you have to go back to July [sic] something 2002 when the indictment was
brought and we start to worrying about a trial. Right. And the public
accusation, the anxiety, and what happens? Bluestein comes in and says we're
going to dismiss that indictment. The day it came here, we're going to dismiss
it, so we can't file a motion for speedy trial. We can't - - we're sitting there
going, okay. Then we get a new attorney. Bluestein is still involved, but we
get a new attorney. And by - - first of all, the first indictment - - remember,
Judge, the indictment they had done all the investigation and brought an
indictment. They had already done that. And then they didn't like that
indictment. They brought in a new attorney.

 Now, that's 2002, for, what, three years, they are looking at bank
records? Come on. That's - - what could the defense do at all? We have
already been told and this court was told and Judge Keeshan was told and
Judge Alworth was told this indictment is going to be dismissed in 2002.


 THE COURT: When was that dismissed, the other, the first - - 


 MR. DEGEURIN: It wasn't finally dismissed until they brought the
new indictment two and a half years later. 


 . . . .


 MR. DEGEURIN: So what makes this case different from most [sic] the
ones that you see, Judge, is the very fact that goes back to this attorney pro tem
thing. It's the very fact that you go public. She accepted a bribe. And then
tell us the same day we're going to dismiss it. 


 . . . .


 MR. DEGEURIN: So we can't start at 2004. We've got to - - that's
when it got on your clock and we asked for continuances before you. 


 THE COURT: What happened to those indictments should have
happened to those indictments, and they were dismissed and so those are gone
and now - - 


 MR. DEGEURIN: Same charge, same conduct.


 THE COURT: But we are barely six months later, seven months, tops. 
Okay. Mr. Wilson.


 MR. DEGEURIN: The clock - - quote, the clock begins, for the
purposes of the speedy trial analysis, when the defendant became the accused,
either charged or arrested. That's 2002. I hadn't finished presenting my
motion but if he wanted - - 


 THE COURT: But, Mr. DeGeurin, what would have happened at that
point had you urged that at that point, those indictments would have been
dismissed.


 MR. DEGEURIN: I don't know.


 THE COURT: You would have received - - that would have been the
best you could have hoped for. The most serious sanction that could have
happened to the State for not proceeding faster would have been a dismissal
of the indictments, and that's what happened on October 20th of '04. 


 MR. DEGEURIN: You mean if I had waited a couple of years and then
filed a motion to dismiss the case that they said there were going to dismiss
anyway?


 THE COURT: No. At any time along that time you had moved or
complained of the length of time that it took them to get to trial from the
original indictment or from whichever point you are going back to.


 MR. DEGEURIN: Because they told me they were going to dismiss the
case. What am I going to do? Ask the judge to dismiss the case. They say,
DeGeurin, we are going to dismiss the case. 


 THE COURT: You could have made the same motion that you are
making now.


 MR. DEGEURIN: No, I don't think I could. How could I have done
that?


 . . . .


 THE COURT: . . . Mr. Wilson, any response?


 MR. WILSON: Yes, Your Honor, I would point out to the Court that
counsel filed his first motion for speedy trial [sic] on the - - last Friday. The
Court is hearing it at this time, and it's set for trial in two weeks. 


 MR. DEGEURIN: Not a Motion for Speedy Trial, Motion to Dismiss
for Violation - -


 MR. WILSON: Then counsel has never filed a request for speedy trial,
Your Honor.


 MR. DEGEURIN: I don't want a trial. I want it dismissed. 


(emphasis added).


 The trial court held an evidentiary hearing on May 10 and 11, 2005, heard testimony
from appellant and the State's witnesses, granted the motion, and dismissed the indictment. 
At the conclusion of the evidentiary hearing, the trial court announced its findings and its
ruling as follows: 

 THE COURT: Regarding the motion to quash or dismiss the indictment
of Terri Lynn Dornburg, due to violation of right to speedy trial, the Court
found there was a delay, a length of delay of 30 months from the original
indictment, April 30th 2002, until the dismissal of the indictment in October
20th of 2004. There would be another seven months until the trial which is set
for May 24th of 2005. With that, triggered the other Barker v. Wingo factors
out of the 407 U.S. 514 that is a 1972 case. Those were now to be considered. 
It became the State's burden to excuse the delay. I looked at the reason for the
delay. The Court has considered the evidence, including the fact that the State
and investigator had to go through two to three years worth of records to
peruse - - and for both Terri Lynn and Brent Dornburg, that there were bank
records requested and then reviewed from eight different institutions, the
investigation of other possible defendants, time lost when the case was
transferred from the special prosecutor in the AG's office to the attorney pro
tem, Terry Wilson, which was done on May 17th of 2002. This was not a
delay for preindictment investigation which would be scrutinized under the
Due Process clause per Griffith v. State, 976 Southwest Second 686, a Court
of Appeals case out of Tyler, but these were all post indictment matters.

 I looked also at assertion of the right. The defense attorney himself
joined in two motions for continuance that moved this case to this May 24th
date from, I believe, a November date, and the defense did not file a motion to
dismiss the indictment due to violation of right to speedy trial until April 29
of 2005. There is case law that shows that there is no - - demand and waiver
is not the law in Texas. 

 I looked at lastly the prejudice resulting from the delay. There was
evidence regarding memories and the deceased individuals, but that was not
compelling evidence as was the rest of the evidence. The Speedy Trial Act is
designed to protect these interests per Munoz v. State, 991 Southwest Second
818, a Texas Court of Criminal Appeals case from 1999 that you are all
familiar with. It prevents oppressive pre-trial incarceration. It minimizes
anxiety and concern of the accused. It limits the possibility that the defense
will be impaired. That's probably the most serious because the inability of a
defendant to adequately prepare his case skews the fairness of this entire
system. I did not find oppressive pre-trial incarceration. The evidence,
though, of anxiety and concern was of a total upheaval in careers and even a
back-up teaching career and a disruption of family life. When a defendant
makes a prima facie showing of prejudice, the State bears the obligation of
proving that the accused suffered no serious prejudice beyond that which
ensued from ordinary and inevitable delay. Here the first indictments were
dismissed but reindicted before dismissal. The only difference that this court
could find between the first and second indictment for bribery included the
name of the individual, Eugenia Schouten, which evidence shows was known
in April of 2002 and an amount of money has changed.

 The Court finds that the State has not excused the delay. The Court
grants the motion to quash or dismiss the indictment of October 2004 for the
violation of right to a speedy trial. 


 As noted above, in reviewing the trial court's ruling, we must uphold the ruling if it
is supported by the record and is correct under applicable law. See Shaw, 117 S.W.3d at 889. 
LENGTH OF THE DELAY AND REASON JUSTIFYING THE DELAY 


 As these factors are closely related, we examine them together. See Barker, 407 U.S.
at 530-31. The Barker Court noted that given the imprecision of the speedy trial right, to find
a delay to be "presumptively prejudicial," thereby triggering an examination of the other
Barker factors, the "peculiar circumstances of the case" must be taken into account. Barker,
407 U.S. at 530-31; Zamorano v. State, 84 S.W.3d 643, 648-49 (Tex. Crim. App. 2002). As
the Supreme Court explained, "[D]elay that can be tolerated for an ordinary street crime is
considerably less than for a serious, complex conspiracy charge." Barker, 407 U.S. at 531. 
 

 The record before us indicates the charge against appellee was more closely akin to
a "complex conspiracy charge," and not "an ordinary street crime." At the April 6, 2005,
continuance hearing, trial counsel argued in tandem with Brent's defense counsel that at that
time there were roughly 1100-1200 pages of bank records to examine and a number of audio
tapes to listen to for the defendants to be in a position to file legally effective pretrial
motions. The State agreed, describing the bank records as "extensive." The length of the
delay was further exacerbated by the fact that at the time of the alleged crime, appellee was
employed by the Montgomery County District Attorney's Office, the agency that prosecutes
such crimes. The district attorney initially requested assistance in prosecuting appellee from
the Texas Attorney General's Office. Later, the district attorney decided to recuse his "whole
office" from prosecuting appellee, declined further assistance from the Attorney General's
Office, and filed a motion with the trial court for appointment of an attorney pro tem. The
attorney pro tem, Terry Wilson, was appointed and sworn in on May 17, 2002. 

 From this somewhat "staggered start" to appellee's prosecution, as well as from what
appears to be a seriously complex case, we are not prepared to find a lack of justification for
the roughly thirty month delay from the initial indictments of April 30, 2002, through the re-indictment on October 12, 2004. (3) The record indicates that after changing hands twice,
appellee's prosecution proceeded with only a single attorney, a single investigator, and a
single "expert" document examiner. The investigation surrounding the charges involved,
inter alia, issuing subpoenas for, and then examining, records and documents from a number
of sources, including investment and financial institutions and credit card companies. The
investigation also included "months" of reviewing dismissals of misdemeanor cases for over
a two or three year period of time. See Harris v. State, 827 S.W.2d 949, 957 (Tex. Crim.
App. 1992) (apparent from the record that State's case was in fact quite complicated,
although not argued to trial court as one of Barker factors). 

 However, neither are we prepared to find that all of the roughly thirty month delay
was entirely attributable to the normal course of pretrial proceedings and preparation. 
Although the case was indeed complex in nature - - involving appellee, her husband, a
number of her husband's clients, a paper-trail of various financial records and misdemeanor
dismissal records, and a change of prosecutorial entities - - the thirty months is a significant
period of delay. On balance, therefore, we weigh the first two Barker factors only slightly
in appellee's favor.

 Of greater significance and, we believe, most damaging to appellee's speedy trial
claim, is the fact that the record does not indicate appellee ever clearly invoked her right to
a speedy trial. Assertion of the right is entitled to strong evidentiary weight in determining
whether an accused was deprived of the right. Barker, 407 U.S. at 531-32. However, a
lengthy delay in asserting the right makes it difficult for an accused to prevail on a speedy
trial claim. See Shaw, 117 S.W.3d at 890. The Court in Shaw explains as follows:

 This is so because a defendant's failure to make a timely demand for a speedy
trial indicates strongly that he did not really want one and that he was not
prejudiced by not having one. Dragoo v. State, 96 S.W.3d at 314. 
Furthermore, the longer the delay becomes, the more likely it is that a
defendant who really wanted a speedy trial would take some action to obtain
one. Ibid. Thus, a defendant's inaction weighs more heavily against a
violation the longer the delay becomes. Ibid.


Shaw, 117 S.W.3d at 890; see also Harris, 827 S.W.2d at 957. The record indicates appellee
did not raise the speedy trial issue during the entire pendency of the 2002 indictments and
did not file the "motion to dismiss" for over six months after she was re-indicted in 2004. 
Trial counsel's only explanation for this failure was that the State continued to promise to
dismiss the 2002 indictments. Trial counsel argued to the trial court that he could not have
made the same motion any sooner than he had. Trial counsel was mistaken as invocation of
the right to a speedy trial "need not await indictment, information, or other formal charge." 
United States v. Marion, 404 U.S. 307, 321, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). 

 Equally troubling is what appears to be appellee's misplaced notion that a motion to
dismiss for lack of speedy trial was the most effective way to prevail on a speedy trial claim. 
It is apparent from the face of appellee's motion and from the assertions of trial counsel at
the May 5, 2005, hearing that appellee's "'prime object was not to gain a speedy trial, but
was an attempt to have the charge against [her] dismissed.'" See Phillips v. State, 650
S.W.2d 396, 401 (Tex. Crim. App. 1983) (quoting McCarty v. State, 498 S.W.2d 212, 215-16
(Tex. Crim. App. 1973)). "Although a motion to dismiss notifies the State and the court of
the speedy trial claim, a defendant's motivation in asking for dismissal rather than a prompt
trial is clearly relevant, and may sometimes attenuate the strength of his claim." Phillips, 650
S.W.2d at 401 (citing McCarty, 498 S.W.2d at 216); see also Marquez v. State, 165 S.W.3d
741, 749 (Tex. App.--San Antonio 2005, pet. ref'd). Furthermore, an accused's "sparse and
delinquent assertions of his right to a speedy trial weigh in favor of the State's position." See
Emery v. State, 881 S.W.2d 702, 709 (Tex. Crim. App. 1994); Haney v. State, 977 S.W.2d
638, 642 (Tex. App.--Fort Worth 1998, pet. ref'd). It is clear from the record that appellee
was not seeking a speedy trial when her motion was filed but was clearly seeking a dismissal
of the 2004 indictment. Trial counsel responded to the State's observation that appellee
never requested a speedy trial by stating, "I don't want a trial. I want it dismissed." 

 At any rate, even had appellee appropriately asserted her right, it must be viewed in
light of appellee's other pretrial conduct. See United States v. Loud Hawk, 474 U.S. 302,
314, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). To begin with, appellee's persistent assertion
that the State's promise to dismiss the 2002 indictments precluded her from filing a motion
to dismiss or asserting her speedy trial rights is not supported by the record. Two days after
trial counsel filed his notice of representation, he filed a written motion to determine the
validity of the attorney pro tem's appointment. While Appellee seems to find support in
language from Dragoo, 96 S.W.3d at 315, Appellee provides no authority for the proposition
that an alleged pretrial promise by the State to dismiss an indictment obviates any need on
the part of an accused to assert her right to a speedy trial pursuant to Barker. Furthermore,
appellee does not explain the context of the State's alleged promise to dismiss the 2002
indictments. Was the purported reason for the dismissals because there was a lack of
sufficient evidence or because the language used in the indictments subjected them to being
quashed? If for the latter reason, trial counsel surely must have anticipated the likelihood of
re-indictment resulting in appellee's facing the same or similar charges. Regardless, the State
made good on its "promise" as the 2002 indictments were dismissed on October 20, 2004. 
 Lastly, the record clearly indicates that trial strategy played an important role in
appellee's decision to assert her speedy trial right when she did. During the April 6, 2005,
hearing on appellee's motion for continuance, recall that trial counsel responded to the trial
court's question as to why he did not earlier seek a specific discovery order from the court
for the various financial records: 


 MR. DEGEURIN: Well, Your Honor, that's a good point; but what is,
in today's time, informal discovery, sometimes go further than what the Court
could order as a matter of law. . . . So I could envision a hearing where the
Court could say in the end, well, you can give them the statements attributed
to the defendants, but I cannot order, Mr. DeGeurin, that you get the whole
report. You will have to wait until trial and then we would be in a whole
another ball. We would have to file a bunch of unnecessary motions and
severances and things like that. So there is some benefit, especially where the
clients are not in custody, and they are not a threat to the community while
awaiting trial, and it is not opposed by the State, there are some times that it's
a benefit to have the informal discovery. That's why we haven't burdened you
with a motion.


 On balance, we find appellee's failure to timely and persistently assert her right to
speedy trial weighs so heavily against appellee as to attenuate any prejudice except for the
most serious. See Dragoo v. State, 96 S.W.3d 308, 315 (Tex. Crim. App. 2003) ("In view
of the lengthy delay here, in which appellant quietly acquiesced, this factor weighs very
heavily against finding a violation of the speedy trial right."). 

PREJUDICE TO APPELLEE RESULTING FROM THE DELAY


 When balancing this factor, a reviewing court must do so in light of the interests
which the speedy trial right is intended to protect, namely: 1) to prevent oppressive pretrial
incarceration; 2) to minimize the accused's anxiety and concern; and 3) to limit the
possibility that the defendant's defense will be impaired. See Barker, 407 U.S. at 532; Shaw,
117 S.W.3d at 890 (citing Barker, 407 U.S. at 532). Of these three interests, "the most
serious is the last, because the inability of a defendant adequately to prepare his case skews
the fairness of the entire system." Shaw, 117 S.W.3d at 890 (citing Barker, 407 U.S. at 532). 
With respect to the third interest, affirmative proof of prejudice is not essential because
excessive delay in bringing an accused to trial compromises the reliability of a trial in ways
neither party can prove or even identify. See id. (citing Doggett v. United States, 505 U.S.
647, 655, 112 S.Ct. 2682, 120 L.Ed.2d 520 (1992)). However, the presumption of prejudice
to the accused's ability to defend himself is "extenuated . . . by the defendant's acquiescence"
in the delay. Id. (quoting Doggett, 505 U.S. at 658). 

 In the instant case, the trial court found no oppressive pretrial incarceration. The
record supports this finding as from all indications, appellee was never incarcerated, having
apparently remained free on a personal recognizance bond following the indictments of 2002
and the re-indictment in 2004. The trial court's finding -- "[t]here was evidence regarding
memories and the deceased individuals, but that was not compelling evidence . . . ." -- is also
supported by the record as there was little to no evidence regarding faded memories, and
appellee made no serious attempt to set out what probative testimony could have been
provided by the deceased witnesses. See Harris v. State, 489 S.W.2d 303, 308 (Tex. Crim.
App. 1973) (a prejudice claim based on unavailable witnesses must include proof
establishing, inter alia, that the witnesses' testimony might be material and relevant to
accused's case). See also Ortiz v. State, 144 S.W.3d 225, 229-30 (Tex. App.--Houston [14th
Dist.] 2004, pet. ref'd) (party has burden to develop sufficient record in trial court to support
his position for appellate purposes). 

 The trial court's ruling from the bench appears to focus heavily on the "minimize
anxiety and concern" interest as the reason for granting appellee's motion to dismiss: "The
evidence, though, of anxiety and concern was of a total upheaval in careers and even a back-up teaching career and a disruption of family life. When a defendant makes a prima facie
showing of prejudice, the State bears the obligation of proving that the accused suffered no
serious prejudice beyond that which ensued from ordinary and inevitable delay." 

 Trial counsel called appellee to testify concerning the prejudice factor. She testified
that prior to the 2002 indictments she was employed as an assistant district attorney for
Montgomery County. She stated that she loved her job, and had plans to become a felony
prosecutor and possibly to run for judicial office at some point. Following the 2002
indictments, appellee testified that her life changed: she lost her job in February 2002, and
although initially able to gain employment with "Hopkins Law Firm," she later resigned from
the firm. When asked if there was a relationship between the "public accusation of you
pending in Montgomery County," appellee responded: "The second indictment came down
October of 2004. It was covered in the press in November. There was a lapse of time. And
I was asked to leave Hopkins Law Firm in November of 2004 following the press coverage." 
It would appear that her job loss with the Hopkins Firm was not because of any delay prior
to the 2004 re-indictment. 

 Appellee further testified she lost her position as president of a church pre-school
school board. She then stated that although she had enjoyed prosecuting, "when I loss [sic]
my job as a prosecutor, I fell out of love with law altogether[.]" At that point, appellee
completed some school work in hopes of obtaining an education certificate, but has been
denied certification while the case was pending. At this point, trial counsel asked appellee
to explain what the "period of public accusation" did to her life: 

 A. I loved my job as a prosecutor. I enjoyed my work at the church with the
Grace Kids Program. At the time of these accusations, I had a 1-year old and
an infant. They are now 4 and 5. I have loss [sic] all that time to truly enjoy
being a mother with these little boys. I will never get that time back with
them.

 I wake up a happy person. Like my teachers, when I was little, always
called me Jolly. And I have good out look [sic] on life. But for the last,
almost 4 years, I wake up and immediately devastated [sic] when I realize this
is not a bad dream. It is real. I deal with that every day throughout the day
while trying to raise these two little boys. 

 It has been very hard on my family, my father, my mother, my sister. I
have grandmother [sic] that I was the closest to. She passed away 6 months
[sic] while all this is still pending. So, I will never get the chance to sit down
with her and explain the outcome.


 Taking appellee's testimony as entirely true, as we must, we find the various facts and
circumstances described by appellee to be nothing extraordinary for any individual facing
criminal charges. See Shaw, 117 S.W.3d at 890 (defendant offered no evidence that delay
caused an "unusual anxiety or concern, i.e., any anxiety or concern beyond the level normally
associated with being charged with a felony sexual crime"). Furthermore, it appears that,
except for the inability to be certified as a teacher, the various negative incidents described
were not directly attributable to the lapse of time between the return of the 2002 indictments
and the re-indictment in 2004. See Munoz, 991 S.W.2d at 826 (if accused makes prima facie
showing of prejudice, State must prove that accused suffered "'no serious prejudice beyond
that which ensued from the ordinary and inevitable delay'" (quoting Ex parte McKenzie, 491
S.W.2d 122, 123 (Tex. Crim. App. 1973)). Additionally, it would appear that appellee
voluntarily refrained from seeking any law-related employment as she "fell out of love with 
law altogether" after resigning her position at the district attorney's office. (4) At any rate, our
examination of appellee's testimony, along with all of the facts and circumstances contained
in the record, leads us to weigh Barker's prejudice factor only slightly in appellee's favor. 
The record indicates the trial court placed most importance on the prejudice factor and the
"upheaval" caused by the pending criminal charges. However, Barker makes clear that no
single factor of the four factors is necessarily "more important" than any other, viz:

 We regard none of the four factors identified above as either a
necessary or sufficient condition to the finding of a deprivation of the right of
speedy trial. Rather, they are related factors and must be considered together
with such other circumstances as may be relevant. In sum, these factors have
no talismanic qualities; courts must still engage in a difficult and sensitive
balancing process. 


Barker, 407 U.S. at 533 (footnote omitted). 

 Having addressed the four Barker factors, we must now balance them together. We
note first that while the thirty month delay in question was by no means insignificant, and
was not entirely explained by the State, it was not excessive given the complexity of the
State's case against appellee and the mere three-person "team" that shouldered the entire
investigative and prosecutorial burden. These two factors weigh only slightly in favor of
finding a violation of appellee's speedy trial right. Weighing heavily against finding a
violation are the following facts: appellee failed to make any mention of her speedy trial
right until almost thirty-six months after the 2002 indictments were filed, and when she did
finally file her motion, she requested dismissal instead of invoking the right to a speedy trial. 
Both facts indicate she really did not want a speedy trial. See Dragoo, 96 S.W.3d at 316. 
Finally, the fact that appellee was only able to demonstrate slight prejudice attributable to the
delay again tips the scale only very slightly in her favor. We hold that the weight of the four
factors, balanced together, is against finding a violation of appellee's right to a speedy trial. 
See Barker, 407 U.S. at 534-36 (where defendant was not seriously prejudiced by five-year
delay between arrest and trial and he did not really want a speedy trial, his right to a speedy
trial was not violated); Dragoo, 96 S.W.3d at 316 (where defendant demonstrated no serious
prejudice by three-and-one-half year delay between arrest and trial and he waited until just
before trial to assert his right to speedy trial, his right to a speedy trial was not violated). 

 We repeat the observation quoted at the beginning of this opinion: "The right of a
speedy trial is necessarily relative. It is consistent with delays and depends upon
circumstances. It secures rights to a defendant. It does not preclude the rights of public
justice." Barker, 407 U.S. at 522 (quoting Beavers v. Haubert, 198 U.S. at 87). We can only
echo the conclusion reached by the Barker Court that, barring extraordinary circumstances,
we would be reluctant to rule that an accused was denied her constitutional right to a speedy
trial on a record that strongly indicates, as does this one, that the accused did not want a
speedy trial. Barker, 407 U.S. at 536. Giving deference to the trial court's finding on the
relevant facts and having balanced the Barker factors, we conclude that the record does not
support the trial court's ruling. The State's appellate issues are sustained. We reverse the
trial court's May 13, 2005, order of dismissal with prejudice and remand this cause to the
trial court with instructions to reinstate the indictment. 

 REVERSED AND REMANDED.


 _______________________________

 CHARLES KREGER

 Justice

Submitted on December 15, 2005 

Opinion Delivered March 1, 2006

Do Not Publish


Before McKeithen, C.J., Kreger and Gaultney, JJ.
1. All emphasis in this opinion is added unless otherwise indicated.
2. Appellee was apparently released on a personal recognizance bond for the
tampering- with-government-record cause as well. 
3. Within eight days from re-indictment the trial court issued a discovery order and a
scheduling order setting trial for January 18, 2005. From that point, appellee could have
gone to trial but for acquiescing in the "Joint Motion For Continuance," filed on
December 16, 2004, and agreeing to a new trial setting for April 25, 2005. Further delay
was excusable by appellee's second continuance motion filed April 6, 2005, the hearing
excerpts from which are set out above.
4. Appellee did, nevertheless, secure employment with the Hopkins firm shortly
after resigning from the district attorney's office in early 2002 and remained so employed
until shortly after she was reindicted in October of 2004.